UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER BLAKE PAULOS,

      Plaintiff,                                        Civil Action No. 12-CV-13390

vs.                                             HON. BERNARD A. FRIEDMAN

COMMISSIONER OF
SOCIAL SECURITY,

      Defendant.

_____/

**OPINION AND ORDER REJECTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION AND**
**REMANDING MATTER TO DEFENDANT FOR FURTHER PROCEEDINGS**

      This matter is presently before the Court on cross motions for summary judgment [docket entries 10 and 12]. Magistrate Judge Mark A. Randon has submitted a Report and Recommendation ("R&R") in which he recommends that defendant's motion be granted and plaintiff's motion be denied. Plaintiff has filed timely objections to the R&R. Pursuant to Fed. R. Civ. P. 72(b)(3) the Court reviews de novo those portions of the R&R to which timely objections have been made.

      The basic facts of this case are summarized in the R&R and in the decision of the Administrative Law Judge ("ALJ") (Tr. 17-27). In short, plaintiff claims he has been disabled since July 2006 due to a combination of factors, including pain in his neck and back, hypertension, depression, anxiety, attention deficit hyperactivity disorder and memory loss. Plaintiff's back and neck pain stem from an accident in 1993 when he fell 40 feet at a rock quarry and fractured a vertebra in his neck. Plaintiff "sustained a C5 burst fracture and subsequently underwent a cervical spinal fusion at C4 and C6" (Tr. 22, 26). Plaintiff testified that he has "[e]xtreme pain . . . [c]hronic

pain throughout my neck and head" (Tr. 40).  The pain is in "my neck where the fusion was done" and radiates down his back and into his shoulders and arms (Tr. 41).  The neck pain is constant "even with the medications" (Tr. 42).  Plaintiff also has pain in his hips, knees and ankles (Tr. 45-46).  Plaintiff estimated he can walk or stand for 15 minutes (Tr. 56-57).  Plaintiff testified he must "lay down for a while, flat, to get all the pressure off of my back and neck" (Tr. 57).  He indicated he lies down three or four times per day for "[u]sually no less than an hour" each time (Tr. 59-60).

In response to a hypothetical question that assumed a person with "the residual functional capacity to sit six of eight hours of an eight-hour workday, stand or walk two hours of an eight-hour workday, lift as much as ten pounds only occasionally" and allowed for a sit-stand option but did not allow the person to "lie down during the course of a typical workday," the vocational expert ("VE") identified 1,900 information clerk jobs, 2,100 video surveillance monitor jobs, 1,700 visual inspector jobs, and 1,800 I.D. clerk jobs which such a person could perform (Tr. 63-65).  On cross examination the VE testified that if plaintiff needs to lie down three or four times per day, this would preclude all work (Tr. 66-67).  Finding that the hypothetical question described plaintiff, the ALJ found that plaintiff is not disabled because he can perform these jobs notwithstanding his "severe impairments [of] status post C5 vertebral fracture and C4-C6 spinal fusion, mild broad-based disc bulge with small right paracentral herniation at L5-S1 with impression on the thecal sac, carpal tunnel syndrome, attention-deficit hyperactivity disorder, and depression" (Tr. 19, 27).  The magistrate judge recommends that the Court grant summary judgment for defendant on the grounds this conclusion is supported by substantial evidence.

In his objections, plaintiff does not take issue with the ALJ's findings as to his mental limitations, but argues that the ALJ erred in failing to give controlling weight to the opinion of his

treating physician, Dr. Theodore D. Engelmann, D.O., who opined that plaintiff's physical limitations are disabling. In a report dated October 26, 2010, Dr. Engelmann indicated among other things that plaintiff can sit for one hour and stand and/or walk for less than one hour in an eight-hour workday, that he "requires complete freedom to rest frequently without restriction," that he must "lie down for substantial periods of time during the day" because he "suffers from severe neck tra[u]ma and multiple tra[u]matic injuries in a fall in 1993 [and] is in constant pain and uses wrist splints and cane for ambulation," and that plaintiff's limitations are permanent and his symptoms will worsen (Tr. 345-49). The ALJ provided the following explanation for discounting Dr. Engelmann's opinion:

> In this instance, Dr. Engelmann's opinion is not entitled to controlling weight because it is not consistent with the other substantial evidence in the record. While Dr. Engelmann has seen the claimant on a regular basis for a number of years, the records indicate that most of these visits were simply for medication refills (Exhibit 6F). Further, Dr. Engelmann's treatment is only afforded limited weight because it is not supported by the examinations of the consultative examiners, or MRI testing that had mild to moderate findings. His opinion that the claimant's condition is expected to deteriorate further is consistent and given significant weight, but his opinion regarding the claimant's current abilities is not supported by the records. The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality that should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

(Tr. 24.)

The Court is not persuaded that the ALJ gave Dr. Engelmann's opinion proper

3

weight.  As the magistrate judge noted, under the "treating source rule"

> [t]reating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).

> The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion. *Id.* § 404.1527(c)(2). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).   "Even if the treating physician's opinion is not given controlling weight, 'there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference.'" *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009), *quoting Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007).

In the present case, the ALJ failed to give "good reasons" for according Dr. Engelmann's opinion little weight.  The critical aspect of Dr. Engelmann's opinion is that plaintiff, because of his neck and back pain, "requires complete freedom to rest frequently without restriction" and that he must "lie down for substantial periods of time during the day."  While the ALJ asserts

4

that Dr. Engelmann's opinion "is not consistent with the other substantial evidence in the record," he points to no evidence in the record that suggests plaintiff does not have severe neck and back pain or that plaintiff does not need to rest and lie down frequently throughout the day, as plaintiff testified. Instead of deferring to Dr. Engelmann, who saw plaintiff 44 times between July 2006 and February 2010 (Tr. 246-86)[1], the ALJ found it more significant that Dr. Lazzara, who saw plaintiff once for a consultative examination in February 2010, observed plaintiff walk with a normal gait and get on and off the examination table without difficulty (Tr. 313, 316), and that the psychologist, Michael Matouk, who conducted a mental status examination in January 2010, observed plaintiff walk with a normal gait and erect posture (Tr. 308). However, there is no inconsistency between an ability to walk normally (for the few seconds or minutes plaintiff was observed doing so on these two occasions) and the need to rest and lie down frequently throughout the day.[2] Plaintiff does not contend he is unable to walk; he testified he can do so for 10-15 minutes (Tr. 56). Nor has Dr. Engelmann opined that plaintiff is unable to walk; he indicated plaintiff can stand and/or walk for less than an hour in an eight-hour period (Tr. 345). Therefore, the fact plaintiff has been seen walking normally and erectly is not a "good reason," or even an arguably logical one, for rejecting the treating physician's opinion regarding plaintiff's need to rest and lie down frequently.

---

[1] In his objections, plaintiff indicates he saw Dr. Engelmann "some 81 times between September 6, 2005 and December 8, 2011. (A.R. 349-352)." Pl.'s Obj. at 2. This number of office visits is not indicated at these pages of the record.

[2] Elsewhere in his decision, the ALJ dismissed the significance of plaintiff's low GAF score (50) because "that score represents a snapshot of a person's perceived abilities at a particular moment in time" (Tr. 23). The ALJ does not explain why he did not level the same criticism at Dr. Lazzara's and Mr. Matouk's "snapshot" observations of plaintiff's ability to walk. In any event, it is illogical to conclude that a person has no need to lie down frequently to relieve back and neck pain simply because he walks normally and can get on and off an examination table.

Nor is the ALJ's next statement a good reason for doing so: "While Dr. Engelmann has seen the claimant on a regular basis for a number of years, the records indicate that most of these visits were simply for medication refills" (Tr. 24). This statement is unsupported. While many of Dr. Engelmann's office notes contain entries such as "here for med refills" (Tr. 246) and "pt. needs med refills" (Tr. 257), there is no basis for the ALJ's statement that plaintiff's appointments were "simply" for this purpose. Presumably the ALJ's implication is that plaintiff was going to Dr. Engelmann "simply" for medications, and therefore Dr. Engelmann has no basis for expressing an opinion as to plaintiff's condition. However, the office notes do not "simply" show that plaintiff requested and received medication refills. Rather, they also show that Dr. Engelmann reviewed plaintiff's condition, examined him physically, and reviewed test results. While Dr. Engelmann's notes are largely illegible, it is apparent that plaintiff's many appointments were not "simply" for medication refills.

The ALJ's next justification for discounting Dr. Engelmann's opinion is that it is unsupported by the "MRI testing that had mild to moderate findings" (Tr. 26). This statement is illogical.[3] The MRI of plaintiff's cervical spine, taken in April 2009, found:

> Postsurgical changes are noted consistent with anterior cervical spine fusions at C4 through C6 with metal blooming artifact. There is contour irregularity involving the spinal canal, notably at C4 through C6 likely reflecting postsurgical changes. There is mild impression of the C6 posterior arch onto the dorsal aspect of the spinal cord; however, no signal abnormalities of the spinal cord are noted.
>
> Mild straightening of the cervical spine is noted. Vertebral body bone marrow signal appears within normal limits other than postsurgical changes mentioned above. The cervical spinal cord reveals normal

---

[3] Paradoxically, the ALJ also found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" (Tr. 22).

6

signal, caliber and contour. The craniocervical junction is within normal limits. No subluxation, dislocation or acute fracture evident.

CERVICAL DISC LEVELS

C3-4:  No disc bulge, central canal or neural exiting canal foraminal stenosis.
C4-5:  Mild broad disc osteophyte complex without neural exiting canal or central canal stenosis.
C5-6:  Moderate right paracentral disc osteophyte complex without central canal stenosis. Minimal right neural exiting canal foraminal stenosis seen.
C6-7:  Small central disc bulge involving the annuli without central canal stenosis. Moderate left neural exiting canal foraminal stenosis noted.
C7-T1: Again effacement of the dorsal aspect of the spinal cord.

(Tr. 226.)  The MRI of plaintiff's lumbar spine, also taken in April 2009, found

. . . a normal lordotic curvature without subluxation, dislocation or evidence of acute fracture. Vertebral body heights and disc spaces are otherwise maintained and appear within normal limits. Bone marrow signal appears within normal limits. The conus medullaris terminates at approximately L1.

LUMBAR DISC LEVELS
L2-3, L3-4:   No disc protrusion, canal or foraminal stenosis seen. There is mild facet hypertrophy at L3-4.
L4-5:  There is mild facet hypertrophy without disc protrusion, canal or foraminal stenosis seen.
L5-S1: There is a mild broad-based disc bulge with small right paracentral herniation with impression on the thecal sac. No central canal stenosis or neural foraminal stenosis is seen. Mild facet hypertrophy is evident. Additionally, there is near effacement of the right L5-S1 nerve root by the L5-S1 disc.

(Tr. 228.)  Apparently the ALJ equates "mild to moderate findings" on the MRIs with mild to

moderate pain and therefore concludes that Dr. Engelmann's opinion that plaintiff is in constant pain

and must "lie down for substantial periods of time during the day" is unsupported by the MRIs.  The

logic of this argument is lacking.  A mild earthquake can still cause buildings to collapse.  The ALJ

7

does not explain why the "mild" or "moderate" findings in plaintiff's cervical and lumbar spines ("mild impression of the C6 posterior arch onto the dorsal aspect of the spinal cord," mild and moderate cervical disc osteophytes, "effacement of the dorsal aspect of the spinal cord," "mild facet hypertrophy," "a mild broad-based disc bulge with small right paracentral herniation" and "effacement of the right L5-S1 nerve root") could not cause severe pain. The ALJ points to no medical professional's opinion for this proposition. In short, the MRIs are not a "good reason" for the ALJ to reject Dr. Engelmann's opinion.

The ALJ's final reason for rejecting Dr. Engelmann's opinion is that "a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes" and that "physicians . . . might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension" (Tr. 24). Regardless of the ALJ's personal opinions about what "may" or "might" happen, his statutory duty is to base his decision on "substantial *evidence*," not speculation, guesswork or bias. This asserted reason for rejecting Dr. Engelmann's opinion is no reason at all and it is certainly not a "good reason."

The Court concludes that the ALJ has failed "to provide 'good reasons' for discounting the weight given to" Dr. Engelmann's opinion. *Gayheart*, 710 F.3d at 376. Under such circumstances, remand for correction of the error is the usual remedy. *See Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004). On remand, the ALJ must comply with 20 C.F.R. § 404.1527(c)(2), as interpreted by *Gayheart*. As part of this process, the ALJ must further develop the record by obtaining a translation of Dr. Engelmann's office notes (Tr. 246-86), many of which are illegible. Such a translation will shed additional light on the nature and extent of Dr. Engelmann's examinations of and findings regarding

8

plaintiff. This may be done either by calling Dr. Engelmann as a witness or by requesting that he reproduce his notes in typewritten form (*see, e.g.,* Tr. 349).

On remand, defendant must also correct another significant error, namely, the abject failure to develop the record regarding the side effects of plaintiff's many medications. The record is replete with references to the fact that plaintiff takes, or has taken, an astonishing number of prescription medications, including Morphine, Cymbalta, Livitra, Norco, Xanax, Adderall, Prozac, Elavil, Tenormin, Fentanyl, Dilaudid, Venlafaxine, Lofriba, Oxycontin, Ritalin, Lopressor, Wellbutrin and Viagra (*see, e.g.,* Tr. 35, 52, 162, 201, 215, 249, 286, 307), several of which are potent narcotics and many of which have significant and well documented side effects. Dr. Engelmann's office notes indicate that plaintiff routinely, over a period of years, sought and obtained prescription refills (Tr. 246-86). At the hearing the ALJ asked plaintiff why he was "taking all those heavy-duty medications" (Tr. 10) but the ALJ did not inquire about side effects or make any other effort to develop the record as to this obvious, medically and vocationally significant issue. Nor, inexplicably, did the ALJ in his written decision even acknowledge the many medications plaintiff takes.[4] On remand, the ALJ must (1) determine which medications plaintiff is taking and has taken during the relevant time period, (2) make findings as to the nature and extent of these medications' side effects, (3) incorporate these findings in a proper hypothetical question to the VE to determine whether work exists in significant numbers that can be performed by a person experiencing such side effects, and (4) consider the strength and dosage of plaintiff's various pain

---

[4] Under 20 C.F.R. § 404.1529(c)(3)(iv) and 20 C.F.R. § 416.929(c)(3)(iv), the ALJ is required to consider various factors in assessing a claimant's pain, including "[t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms."

medications in assessing plaintiff's credibility regarding the severity of his pain.  Accordingly,

IT IS ORDERED that Magistrate Judge Randon's Report and Recommendation is rejected.

IT IS FURTHER ORDERED that both parties' motions for summary judgment are denied.

IT IS FURTHER ORDERED that his matter is remanded for further proceedings as indicated above.

Dated: August 23, 2013            _s/ Bernard A. Friedman_____
        Detroit, Michigan            BERNARD A. FRIEDMAN
                                   SENIOR UNITED STATES DISTRICT JUDGE